IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs September 3, 2025

IN RE BELLA H.[1] ET AL.

**Appeal from the Juvenile Court for Shelby County**
**No. GG1700      Tarik B. Sugarmon, Judge**

_____

**No. W2025-00545-COA-R3-PT**

_____

The trial court terminated a mother's parental rights to her two minor children after finding clear and convincing evidence that the conditions that led to the children's removal persist, that the mother failed to manifest an ability to assume custody of the children, and that termination of the mother's parental rights was in the best interests of the children. The mother appeals. Upon diligent review of the record, we find no error and affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed; Case Remanded**

KRISTI M. DAVIS, J., delivered the opinion of the Court, in which ANDY D. BENNETT and CARMA DENNIS MCGEE, JJ., joined.

Ada Johnson, Memphis, Tennessee, for the appellant, Elizabeth S.

Jonathan Skrmetti, Attorney General and Reporter, and Clifton Wade Barnett, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

The appellant, Elizabeth S. ("Mother"), appeals the termination of her parental rights to her two minor children: Bella H., born in April 2020, and Zala H., born in May 2022 (together, the "Children").[2] The family became involved with Tennessee Department

_____

[1] This Court has a policy of abbreviating the last names of children and other parties in cases involving termination of parental rights to protect their privacy and identities.

[2] The Children's father's parental rights were terminated in a separate order from which he did not appeal. The father is mentioned only as necessary for context.

of Children's Services ("DCS" or the "Department") in May of 2020 after DCS received a referral from the hospital at which Bella was born. The hospital reported that Mother told "various stories" about her prenatal care and where she was living when Bella was born and that Mother seemed "not to be bonding with Bella." The hospital also reported that Mother had visited the emergency room 161 times between May 2017 and May 2020. DCS filed a petition in the Shelby County Juvenile Court (the "trial court") to adjudicate Bella dependent and neglected and for temporary legal custody of Bella. DCS averred that Mother did not have stable housing, that Mother was diagnosed with schizophrenia but was not receiving treatment, that Mother and George H. ("Father") had a history of domestic violence, and that Father was "facing eviction from his home[.]" The petition also alleged that

> Mother left the hospital after Bella's birth against medical advice. The hospital wanted to complete a mental health assessment on Mother before she was released, but they were unable to do so. Mother has displayed mental health instability since Bella has been at the hospital. Mother says she does not need treatment for her schizophrenia because she is not showing symptoms. Mother has been confrontational with hospital staff that have attempted to help her with taking care of Bella. Mother does not have a stable support system or housing.

On June 9, 2020, the trial court entered an ex parte protective custody order, finding probable cause to believe that Bella was dependent and neglected. Bella was placed in the Department's legal custody, where she has remained since that time. Ten months later, on April 13, 2021, the trial court entered an order finding clear and convincing evidence that Bella was dependent and neglected based upon concerns about Mother's mental health, domestic violence between Mother and Father (who continued living together), and Mother's testimony that she was working to obtain safe and stable housing separate from Father to provide stability for Bella. Mother filed a motion for trial home visit on September 15, 2021. Following a hearing held on September 29, 2021, the trial court entered an order on January 7, 2022, awarding Mother unsupervised visitation with Bella as the first step of "a transition process . . . to reunite" Mother and Bella. As to Father, the trial court found that he had not complied with his permanency plan goals and ordered that he have no contact with Bella pending further orders of the court. Mother filed a second motion for trial home visit in December 2021. The Department alleges that this request was denied and that Mother was "ordered to have only supervised visits with Bella due to the [trial court] finding she continued to associate with [Father] and lie about that association." However, such order is not included in the record on appeal.

Zala was born in May 2022, and Father was named as her father on her birth certificate. On July 19, 2022, DCS filed a petition in the trial court to adjudicate Zala dependent and neglected and for temporary legal custody of Zala. The petition alleged that on July 5, 2022, the Department received a referral alleging that Zala was born premature

- 2 -

and was ready for discharge but that Mother had been staying at the hospital around the clock even though she was not a patient and that she did not have a place to take Zala. The hospital reported that Mother had been asking nurses and doctors for money for transportation, despite having a monthly bus pass, and was asking for a place to wash her clothes. On July 7, 2022, Mother notified DCS that she had secured an apartment and asked DCS to conduct a home assessment. A Child Protective Services Investigator determined that the home was appropriate, and Zala was discharged to Mother on July 7. At that time, Mother denied that she and Father were living together. However, less than a week later, the Department received another referral as to Zala. On July 13, 2022, Le Bonheur Children's Hospital reported that Mother brought Zala to the hospital and that Mother claimed that Father had shaken Zala "to the point her eyes were rolling back in her head and [she was] vomiting." The hospital "medically cleared" Zala that night, and Mother returned home with her. The petition also alleged that on July 18, 2022, during a Child and Family Team Meeting, Mother

> minimized the incident and stated that it happened once. She reported that since that time [Father] has not been back to the home. During the conversation [Mother] stated that she does not have a restraining order against [Father] regarding her or Zala and she does not understand why the Department is so concerned. She stated that she meets with [Father] on the city bus to obtain money for the children. [Mother] refused to give any other contact information for [Father] to ask information about the shaking incident. . . . [Mother] began to make comments during the meeting that she would be leaving the State with the baby immediately. The team decided that it was in the best interest of Zala to enter state custody, while the Department continues to work with her. When the Department went to get Zala the mother was not at her home. She was [down the street] with four bags, all the baby's stuff, and a stroller with the baby.

On October 4, 2022, the trial court found probable cause to believe that Zala was dependent and neglected and placed her in the Department's legal custody effective July 18, 2022, where she has remained since that time.[3] Mother requested a preliminary hearing, which was held on July 21, 2022, at which Mother and a representative of the Department testified. On October 28, 2022, the trial court entered a preliminary hearing order finding that Zala "would be in grave danger if returned to either parent." The trial court also found that Mother's testimony was not credible, that Zala was in the presence of Father who still had a no-contact order with Bella, that Mother misrepresented her relationship with Father to the trial court, and that Mother "is not honest about [Father] and the level of violence by

---

[3] Zala was removed into the Department's physical custody on the morning of July 18, 2022, and the juvenile court signed an *ex parte* protective custody order finding probable cause to believe that Zala was dependent and neglected and placing her in the legal custody of DCS on July 19, 2022. However, that order was not actually entered by the juvenile court until October 4, 2022.

[Father]." Accordingly, the trial court ordered that both parents have no contact with both of the Children. On September 23, 2022,[4] Mother filed a motion for visitation with Zala. In support of this motion, Mother stated that "[F]ather does not have any charges against him, does not have a no-contact order regarding the child, [M]other has always protected her children, and [M]other was not trying to move away when DCS found her at the laundry matt [*sic*] with bags of clothes that needed washing." On March 7, 2023, the trial court entered an order awarding Mother supervised visitation with both Children. On April 26, 2023, the trial court entered an order finding clear and convincing evidence that Zala was dependent and neglected. The trial court noted that at the February 17, 2023 hearing, Mother's testimony about the incident in which Father allegedly shook Zala contradicted what she told the hospital. Mother also testified that she was not receiving mental health treatment "because she stated it wasn't recommended." The trial court found that there was a history of domestic violence between the parents and that both parents testified that they lived "in a hotel, shelter and/or with paternal grandmother[,]" but that such testimony was inconsistent, and that Father "even testified he was hanging out with the mother" the prior weekend. The trial court expressed concern about Zala's exposure to domestic violence if returned to either parent and found that it was in Zala's best interest to remain in the Department's legal custody.

On December 28, 2023, the Department filed a petition in the trial court to terminate both parents' rights to the Children. As to Mother, the Department alleged five statutory grounds for termination: abandonment by failure to support, abandonment by an incarcerated parent by failure to visit and failure to support, substantial noncompliance with the permanency plan, persistence of conditions, and failure to manifest an ability and willingness to assume custody or financial responsibility for the Children. The trial court held a trial on March 6, 2025, at which Mother, an officer with the Memphis Police Department, two DCS case managers, and the Children's foster mother testified. At the outset of the trial, the Department announced that it was voluntarily dismissing all but two of the grounds and would be proceeding only on the grounds of persistent conditions and failure to manifest an ability and willingness to assume custody of the Children.

Mother testified that she was diagnosed with schizophrenia as a child and that she has seizures; a history of heart attacks, strokes, and brain tumors; and is hard of hearing. She reported taking Zophar "for [her] agitation," Keppra for seizures, blood pressure medicine, an inhaler, ear drops, and heart medication. Mother said she only gets agitated when people "argue and fight" with her. She testified that the month before the trial, she was hospitalized twice, including a three-day hospitalization due to seizures and a stroke.

Mother testified that Father hit her twice in 2019, while she was pregnant with Bella, but that he never hit or was violent with the Children. She reported that an assault by Father

---

[4] As with the *ex parte* protective custody order, there was a month-long delay between the preliminary hearing and the resultant order.

led to her delivering Bella when Mother was thirty-two weeks pregnant. Mother stated that she completed domestic violence classes over the phone; however, she also testified that after Zala was removed from her custody, she began dating a second man who physically assaulted her. Throughout her testimony, Mother referred to this man as "Main,"[5] due to her being unable to pronounce his legal name. Mother had a black eye at trial and testified that Main had most recently assaulted her on February 28, 2025, just six days prior to trial. Mother reported that she was twenty weeks pregnant at the time of the February 28 assault and suffered a miscarriage, an injured lip, and loss of vision in her right eye because of the assault. She testified that her vision loss persisted at the time of trial.

Mother testified that she broke up with Main after this assault and was cooperating with law enforcement regarding the resultant criminal charges against him. Mother stated that Main assaulted her for the first time in May 2024, at which time he was arrested and ordered to have no contact with Mother, but that he violated the no-contact order. Mother also testified that Main assaulted her in November 2024; however, she denied that he assaulted her in January 2025 when a bus driver reported to law enforcement that he had witnessed Main assault Mother. At the time of trial, Mother was living in an apartment which DCS had not yet assessed. Mother testified that a DCS case worker was scheduled to visit the apartment the day before the trial but that the visit ultimately did not happen.

Next, Officer James Silverdahl with the Memphis Police Department testified that on November 7, 2024, he responded to a call reporting an assault at Methodist North Hospital. He reported that Mother told the responding officers that she had been assaulted by her boyfriend shortly before the officers arrived. He observed that the right side of Mother's face was swollen, and he testified that Main was arrested for domestic assault as a result of the incident.

Dorian Tate, a DCS case manager, then testified. Mr. Tate stated that he was the Children's case manager from approximately February 2024 through September 2024. He testified that the permanency plan ratified by the juvenile court required Mother to submit to a mental health assessment but that he had been unable to locate any such assessment in the Children's file. He said that he asked Mother to provide him with a copy of the assessment, or other proof that it had been completed, but that Mother was unable to provide him with any proof. Instead, Mother provided a list of medications that she was taking and told him she had been diagnosed with "bipolar schizophrenia as well as depression."

Mr. Tate testified that he was concerned about Mother's mental health because she was unable to remember dates, was unable to tell him who performed her mental health assessment, and was inconsistent about things she reported to him. He reported that Mother

---

[5] The spelling of this name varies between the trial transcript and the parties' appellate briefs. We adopt the spelling used in the trial transcript.

told him that she was dating someone who would be at her home "most of the time" but that he never received the information he needed to be able to perform a thorough background check on that person. Mr. Tate stated that although Mother regularly visited the Children during the time he was their case manager, there were multiple visits that Mother either cancelled at the last minute or simply failed to show. Mother would later report that she missed the visits due to medical issues. He testified that during the visits, Bella would get "anxious or kind of hyper" and that Mother seemed "a little overwhelmed" by this behavior. He reported that he referred Mother for a parenting assessment, which the permanency plan required her to complete, but that she never submitted to the assessment. He also told Mother where she could go to complete a mental health assessment; however, she stated that she had already completed it, and she did not see a need to complete another one.

The trial court next heard from Facharee Jones, the Children's case manager at the time of trial. Ms. Jones testified that she took over the file in September 2024 and that Bella was originally removed from Mother's custody due to Mother's mental health. She explained that both Children were ultimately adjudicated dependent and neglected due to concerns about ongoing domestic violence between the parents, along with housing instability and concerns about Mother's mental health. Ms. Jones also testified that the issues preventing the Children's return to Mother were Mother's "ongoing domestic violence relationship with Main as well as Mother's mental health." Ms. Jones reported that Mother told her she had already completed a mental health assessment and that every time Ms. Jones would bring it up, "it turned to an argument" because Mother believed that Ms. Jones should be able to find the record. Ms. Jones stated that every interaction she had with Mother was "just all over the place," explaining that Mother "jumps from one topic to another[,]" is "always confused[,]" could not remember their interactions from one to the next, and would become verbally aggressive with Ms. Jones over the phone.

Ms. Jones reported that between September 2024 and November 2024, Mother repeatedly asked her to do a background check on Main so he could go with Mother to visit the Children but that Main never submitted to a background check. She said Mother told her at that time that Main often stayed at her home. Ms. Jones said that she would tell Mother that it was important for Mother to visit with the Children and that she should be more focused on her relationship with the Children than on Main visiting with the Children. Ms. Jones testified that she had been supervising visits between Mother and the Children and that the visits went well but that approximately thirty minutes into the two-hour visits, the Children would begin asking for their foster mother. She said that at the end of the visits, the Children would run to the foster mother "like it's been weeks since they [saw] her." She expressed concerns about "uprooting" the Children from their foster home and returning the Children to Mother. Specifically, in addition to her concerns about Mother's mental health and ongoing domestic violence in her home, Ms. Jones said that the Children were so used to the foster parents that she did not believe they would adjust if they were

placed with Mother. She reported that the Children love the foster parents and are very bonded to them, especially the foster mother.

Finally, Leslie R., the Children's foster mother ("Foster Mother"), testified that Bella was placed in their home when she was seven weeks old and had been with them for approximately four and a half years. Zala was placed with them when she was three months old and had been with them for a little over two years. The Children live in the foster home with Foster Mother, the foster father, and their six other children. Foster Mother explained that the foster father's extended family are heavily involved in the Children's lives. She said that she and the foster father wish to adopt the Children because "they are already a part of [the] family, and [she] can't imagine them not being there." She said that the Children call her "mommy" or "mom," call the foster father "dad," ask for Foster Mother if they have a bad dream, and do not talk or ask about Mother. She testified that she began keeping a log of Mother's visits with the Children in 2024. Since that time, Mother visited with them for two hours or less in March 2024, May 2024, June 2024, September 2024, and February 2025. She reported that Mother did not visit the Children in the other months.

Foster Mother stated that she was friends with Mother on TikTok and identified photos that Mother had posted on the site. On October 5, 2024, Mother posted a photo of herself lying in a hospital bed wearing a neck brace and a nasal oxygen cannula with a comment that says: "I q a hit [sic] real bad by my dude I ended up in the hospital[.]" The next photo introduced was posted on October 8, 2024, and was a picture of Mother with a man that Foster Mother believed to be Main with large hearts added to the photo. Foster Mother testified that Mother posted similar photos with the same man "pretty frequently" up until the week before trial. Mother also posted a photo on March 1, 2025, showing her with an injured lip and a caption that says "this is what my baby daddy did to me over some damn money[.]" When asked whether the pictures could have been posted by someone else, Foster Mother explained that some of the pictures Mother posted were photos of the Children that Foster Mother had given to Mother and had not given to anyone else.

The trial court found the following by clear and convincing evidence: (1) the Children had been in the custody of the Department for more than six months when the termination petition was filed; (2) the conditions leading to the Children's removal still persist and other conditions exist that, in all reasonable probability, would cause the Children to be subjected to further abuse or neglect, preventing the Children's safe return to Mother's care; (3) there is little likelihood that these conditions will be remedied at an early date so that the Children can be safely returned to Mother in the near future; and (4) the continuation of the parent-child relationship greatly diminishes the Children's chances of early integration into a safe, stable, and permanent home. The trial court also found by clear and convincing evidence that Mother failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the Children and that placing the Children in Mother's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of

the Children. Finally, the trial court found by clear and convincing evidence that it is in the Children's best interests that Mother's parental rights be terminated.

Mother timely appealed.

## ISSUES

Mother raises three issues on appeal:

I.    Whether the trial court erred in finding by clear and convincing evidence that persistent conditions exist pursuant to Tennessee Code Annotated section 36-1-113(g)(3).

II.    Whether the trial court erred in finding by clear and convincing evidence that Mother failed to manifest an ability and willingness to assume custody or financial responsibility of the Children pursuant to Tennessee Code Annotated section 36-1-113(g)(14).

III.    Whether the trial court erred in finding by clear and convincing evidence that the termination of Mother's parental rights was in the best interest of the Children.

## STANDARD OF REVIEW

"A person seeking to terminate parental rights must prove both the existence of one of the statutory grounds for termination and that termination is in the child's best interest." *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (citing Tenn. Code Ann. § 36-1-113(c)). "Because of the profound consequences of a decision to terminate parental rights, a petitioner must prove both elements of termination by clear and convincing evidence." *In re Markus E.*, 671 S.W.3d 437, 456 (Tenn. 2023). This heightened burden "minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights" and "enables the fact-finder to form a firm belief or conviction regarding the truth of the facts[.]" *In re Carrington H.*, 483 S.W.3d 507, 522 (Tenn. 2016) (citing *Santosky v. Kramer*, 455 U.S. 745, 769 (1982); *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010)). "The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not." *Id.* (citing *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005)).

As our Supreme Court has explained, we employ a two-step process in reviewing termination cases:

> To review trial court decisions, appellate courts use a [] two-step process, to accommodate both Rule 13(d) of the Tennessee Rules of Appellate Procedure and the statutory clear and convincing standard. First, appellate courts review each of the trial court's specific factual findings de

novo under Rule 13(d), presuming each finding to be correct unless the evidence preponderates against it. *In re Taylor B.W.*, 397 S.W.3d 105, 112 (Tenn. 2013); *In re Justice A.F.*, [No. W2011-02520-COA-R3-PT,] 2012 WL 4340709, at *7 [(Tenn. Ct. App. Sept. 24, 2012)]. When a trial court's factual finding is based on its assessment of a witness's credibility, appellate courts afford great weight to that determination and will not reverse it absent clear evidence to the contrary. *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re Justice A.F.*, 2012 WL 4340709, at *7 (citing *In re M.L.D.*, 182 S.W.3d 890, 894 (Tenn. Ct. App. 2005)).

Second, appellate courts determine whether the combination of all of the individual underlying facts, in the aggregate, constitutes clear and convincing evidence. *In re Taylor B.W.*, 397 S.W.3d at 112; *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re Justice A.F.*, 2012 WL 4340709, at *7. Whether the aggregate of the individual facts, either as found by the trial court or supported by a preponderance of the evidence, amounts to clear and convincing evidence is a question of law, subject to de novo review with no presumption of correctness. *See In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *see also In re Samaria S.*, 347 S.W.3d 188, 200 (Tenn. Ct. App. 2011). As usual, the appellate court reviews all other conclusions of law de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d [240,] 246 [(Tenn. 2010)].

*In re Markus E.*, 671 S.W.3d at 457.

## DISCUSSION

*Grounds for termination*

### I. Persistent conditions

The trial court found clear and convincing evidence to support the termination of Mother's parental rights pursuant to Tennessee Code Annotated section 36-1-113(g)(3) (effective July 1, 2023 to June 30, 2024).[6] This statutory ground applies when

> [t]he child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a child is alleged to be a dependent and neglected child, and:

---

[6] In termination cases, we apply the version of the statute in effect at the time the petition was filed. *See In re Braxton M.*, 531 S.W.3d 708, 732 (Tenn. Ct. App. 2017). The termination petition in this case was filed on December 28, 2023.

(i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;

(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and

(iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home[.]

Tenn. Code Ann. § 36-1-113(g)(3)(A). "Each of the statutory elements that make up the ground known as persistence of conditions must be established by clear and convincing evidence." *In re Aaron E.*, No. M2014-00125-COA-R3-PT, 2014 WL 3844784, at *8 (Tenn. Ct. App. Aug. 4, 2014) (citing *In re Valentine*, 79 S.W.3d 539, 550 (Tenn. 2002)).

The purpose behind the "persistence of conditions" ground for terminating parental rights is "to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child." *In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 4613576, at *20 (Tenn. Ct. App. Oct. 13, 2008) (quoting *In re D.C.C.*, No. M2007-01094-COA-R3-PT, 2008 WL 588535, at *9 (Tenn. Ct. App. Mar. 3, 2008)).

*In re Navada N.*, 498 S.W.3d 579, 606 (Tenn. Ct. App. 2016). Additionally,

this ground for termination may be met when either the conditions that led to the removal persist or "other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian[.]" [Tenn. Code Ann. §] 36-1-113(g)(3)(A)(i). Thus, even if the initial reasons that the children were placed in DCS custody have been remedied, if other conditions continue to persist that make the home unsafe, this ground may still be shown.

*In re Daylan D.*, No. M2020-01647-COA-R3-PT, 2021 WL 5183087, at *9 (Tenn. Ct. App. Nov. 9, 2021).

- 10 -

Here, the trial court correctly concluded that this ground is supported by clear and convincing evidence. The trial court heard the termination petition on March 6, 2025.[7] The proof shows that DCS removed Bella from Mother's physical and legal custody in May 2020, that DCS removed Zala from Mother's physical and legal custody in July 2022, and that the trial court later adjudicated both Children dependent and neglected. Mother argues that "[t]here is not any evidence that [she] has not maintained a home or that she will cause harm to her children or would allow anyone else to cause harm to them" and that no therapist has stated "that she is not competent to rear children or that she has a mental defect that affects her ability to parent her children."[8] The primary conditions precipitating removal were Mother's mental health and ongoing domestic violence within Mother's home. As to the domestic violence, we note that Mother had a black eye and other injuries at trial due to her paramour's assault just six days prior to trial. Clearly, the condition of ongoing domestic violence in Mother's home persists. As to her mental health, we first note concerns due to Mother's evasiveness about when she purportedly completed a mental health assessment and any resultant recommendations from such assessment. These concerns are only compounded by Mother's failure to submit to a parenting assessment, even after the Department made a referral. Mother has been diagnosed with schizophrenia, and Mother does not seek treatment for her condition.

Moreover, the record clearly supports the trial court's conclusion that there is little likelihood that conditions preventing the Child's return to Mother can be remedied at an early date. During the trial, Mother insisted that she had done nothing to cause the Children to be removed from her custody and further insisted that the Department's concerns about the ongoing domestic violence in her home were unfounded because she had broken up with Main. There is also sufficient evidence in the record to support the conclusion that a continuation of Mother's relationship with the Children would greatly diminish the Children's chances of being integrated into a safe, permanent home. The Children are currently in a safe, stable, and permanent home with foster parents who have raised them since they were infants. They are thriving, and their foster parents hope to adopt them.

Considering the foregoing, we agree with the trial court that DCS proved persistent conditions by clear and convincing evidence.

---

[7] For purposes of section 36-1-113(g)(3), "[t]he six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard[.]" Tenn. Code Ann. § 36-1-113(g)(3)(B).

[8] Notably, Mother does not cite any authority suggesting that the Department was required to offer proof that Mother "is not competent to rear children or that she has a mental defect that affects her ability to parent her children" to prove this ground. It appears that Mother has incorrectly conflated this ground with the alternative ground set forth in section 36-1-113(g)(8), which was not plead and is not at issue in this case.

## II. *Failure to manifest an ability and willingness to assume custody*

The trial court also found by clear and convincing evidence that Mother failed to manifest an ability and willingness to assume legal and physical custody of or financial responsibility for the Children. This ground applies when

> [a] parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

Tenn. Code Ann. § 36-1-113(g)(14) (effective July 1, 2023 to June 30, 2024). This ground requires clear and convincing proof of two elements. *In re Neveah M.*, 614 S.W.3d 659, 674 (Tenn. 2020). The petitioner must first prove that the parent has failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the child. *Id.* The petitioner must then prove that placing the child in the parent's custody poses "a risk of substantial harm to the physical or psychological welfare of the child." *Id.*

Mother argues that she has "clearly demonstrated her willingness to assume physical and legal custody of her children." However, she does not argue that she has an ability to assume custody of the Children. The statute requires "a parent . . . to manifest both an ability and willingness to personally assume legal and physical custody or financial responsibility for the child." *Id.* at 677. Therefore, if a party seeking termination of parental rights establishes that a parent or guardian "failed to manifest *either* ability or willingness, then the first prong of the statute is satisfied." *Id.* (citing *In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280, *13 (Tenn. Ct. App. June 20, 2018)).

Regarding the second statutory prong,

> [t]he courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

*In re Virgil W.*, No. E2018-00091-COA-R3-PT, 2018 WL 4931470, at *8 (Tenn. Ct. App. Oct. 11, 2018) (quoting *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001)).

The trial court found, in relevant part, that Mother

> continues to have unstable housing, that she continues to have mental health issues that inhibit her ability to understand how to care for her children's needs, and that she continues to engage in relationships with men who abuse her. The Court finds that during the four and a half years history of this litigation that [Mother] has great difficulty taking care of herself, leading the Court to conclude it would be even more difficult for her to properly take care of her children.

> * * *

> The Court finds that the children would be at a substantial risk of physical or psychological harm if they were placed with [Mother]. [Mother] downplayed her history of domestic violence at trial. [Mother] was assaulted less than a week before trial by her boyfriend and she still had the marks of the assault at trial. Ms. Jones testified that in her discussions with [Mother] about visiting more regularly that [Mother] would focus on when the children could meet her boyfriend [] and she would not address the fact she continued to miss visits. Ms. Jones testified that the visits are set up around [Mother's] schedule as [Mother] is the one without a car. Despite this, [Mother] often cancels visits last minute. [Mother] reports she moved recently, but she did not allow the Department to do a home study on the home before the trial so that the worker could ensure it was safe and appropriate. [Mother] has a bond with her children, but she does not have the level of bond needed to sustain her ability to parent full-time. The children enjoy visiting with [Mother], but after about thirty minutes they are asking for the foster parent. [Mother] testified to a series of physical ailments that cause her to need frequent medical attention- seizures, heart murmurs, heart attacks, a recent stroke, and brain tumors. [Mother] also testified she has schizophrenia which causes her to get "agitated" sometimes even while on medication. The Court finds that any average person with that combination of diagnoses would find it extremely difficult to care for children on their own.

(Internal paragraph numbering omitted). Having reviewed the record, the evidence preponderates in favor of the trial court's factual findings regarding Mother and section 36-1-113(g)(14). We agree that Mother has failed to manifest an ability to parent the Children. As discussed above, Mother failed to maintain a home free of domestic violence or to meaningfully address her mental health issues. Mother's ongoing pattern of disregard for her own welfare causes serious concerns about her willingness and ability to protect the Children from domestic violence.

For the same reasons, we also conclude that the Department proved the second prong of section 36-1-113(g)(14) by clear and convincing evidence. Given the long period of time the Children have been in the Department's custody, the ongoing domestic violence within Mother's home, and Mother's mental health issues, the Children would be at risk of substantial harm, both physical and psychological, if returned to Mother's custody. Particularly disturbing is Mother's inability or unwillingness to accept any responsibility for the circumstances leading to the Children's removal from her custody. Mother does not seem to recognize the need to protect herself or seek treatment for her mental health, and we have great concern about returning the Children to Mother given these circumstances.

Consequently, the trial court correctly concluded that the Department proved this statutory ground by clear and convincing evidence.

*Best interests*

In addition to proving at least one statutory ground for termination, petitioners in a termination case must prove, by clear and convincing evidence, that termination serves the child's best interests. Tenn. Code Ann. § 36-1-113(c). Indeed, "a finding of unfitness does not necessarily require that the parent's rights be terminated." *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005) (citing *White v. Moody*, 171 S.W.3d 187, 193 (Tenn. Ct. App. 2004)). Our termination statutes recognize that "[n]ot all parental misconduct is irredeemable" and that "terminating an unfit parent's parental rights is not always in the child's best interests." *Id.* As such, the focus of the best interests analysis is not the parent but rather the child. *Id.*; *see also White*, 171 S.W.3d at 194 ("[A] child's best interests must be viewed from the child's, rather than the parent's, perspective."). Further, "the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." Tenn. Code Ann. § 36-1-113(i)(2).

When determining whether termination is in a child's best interests, we refer to twenty non-exclusive factors found at Tennessee Code Annotated section 36-1-113(i)(1)(A)-(T) (effective July 1, 2023 to June 30, 2024). In this case, the trial court applied the correct statutory factors and engaged in a thorough analysis in its final order:

> a. Pursuant to T.C.A. § 36-1-113(i)(1)(A), whether a termination of parental rights will further the children's critical need for stability and continuity of placement throughout the children's minority. [Foster Mother] testified that both children were young infants when they were placed into her home and that her home is the only home that the children know. [Foster Mother] further testified that she and her husband cannot imagine their lives without the girls in their family and that they want to adopt the girls. This factor favors termination of Respondent's parental rights.

b. Pursuant to T.C.A. § 36-1-113(i)(1)(B), whether a change of caretakers and physical environment is likely to have a negative effect on the children's emotional, psychological, and medical condition. Multiple witnesses testified that the children consider the foster parents to be their parents. Testimony was that the children have some bond with [Mother] and enjoy visiting with her, but that they only make it about thirty minutes into a visitation before they get bored and begin asking for their foster mother. This factor favors termination of Respondent's parental rights.

c. Pursuant to T.C.A. § 36-1-113(i)(1)(C), whether the mother has demonstrated continuity and stability in meeting the children's basic material, educational, housing, and safety needs. Testimony was that [Mother] has provided financial support for the children when she does visit. However, the testimony was that [Mother] has seen her children for less than twelve hours in the past fourteen months at only six visits. [Foster Mother] testified that Bella has an individual education plan at her preschool and that sometimes [Mother] attends the meetings, but more often she does not. The testimony was also that [Mother] would cancel visits last minute or simply no show at them which caused Bella to be disappointed. [Mother] has had multiple residences during her children's time in foster care and she has not allowed the Department to check out her current apartment. This factor favors termination of Respondent's parental rights.

d. Pursuant to T.C.A. § 36-1-113(i)(1)(D), whether the mother and the children have a secure and healthy parental attachment, and whether there is a reasonable expectation that the mother can create such attachment. The testimony of [Mother], [Foster Mother], Mr. Tate, and Ms. Jones shows the children do have a bond with [Mother]. The Court does not find that the bond described rises to the level of a secure and healthy parental attachment, however. [Mother] has chosen to cancel many of her visits in recent years. Instead of focusing on attending her visits with the children, Ms. Jones testified that [Mother] was focused on asking when [Main] could begin visiting the children with her. This factor favors termination of Respondent's parental rights.

e. Pursuant to T.C.A. § 36-1-113(i)(1)(E), whether the mother has maintained regular visitation or other contact with the children and whether she used the visitation or other contact to cultivate a positive relationship with the children. Testimony was that [Mother] has some visits with the children and that she behaves appropriately at the visits. However, [Mother] has cancelled or no showed at a majority of her available visits since January of 2024. This factor favors termination of Respondent's parental rights.

f. Pursuant to T.C.A. § 36-1-113(i)(1)(F), whether the children are fearful of living in the home of their mother. This factor weighs neither for nor against termination of Respondent's parental rights as there was no testimony on the subject.

g. Pursuant to T.C.A. § 36-1-113(i)(1)(G), whether the parent, parent's home, or others in the parent's household trigger or exacerbate the children's experience of trauma or post-traumatic symptoms. This factor weighs neither for nor against termination of Respondent's parental rights bec[au]se there was no testimony on the subject.

h. Pursuant to T.C.A. § 36-1-113(i)(1)(H), whether the children have created a healthy parental attachment with another person or persons in the absence of the mother. [Foster Mother] testified that the girls consider she and her husband to be their parents. [Foster Mother] testified that Bella has been in their care for almost five years and that Zala has been in their care for most of the two and a half years of her life. This factor favors termination of Respondent's parental rights.

i. Pursuant to T.C.A. § 36-1-113(i)(1)(I), whether the children have emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings. [Foster Mother] testified that Bella and Zala are well-bonded with the other children in the home. [Foster Mother] testified that she and her husband have five biological children in the home and one adopted child. She testified that Bella and Zala consider the other children to be their brothers and sisters. In turn, the other children in the home consider Bella and Zala to be siblings as well. [Foster Mother] testified that the girls are also well-integrated into and bonded with she and her husband's extended families. She testified that the girls are treated exactly like the other children in the family. This factor favors termination of Respondent's parental rights.

j. Pursuant to T.C.A. § 36-1-113(i)(1)(J), whether the mother has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the children to be in her home. [Mother] was involved in a relationship with [Father] with domestic violence from at least 2019 through Zala entering foster care in 2022. [Mother] testified that she was in a one-year relationship with [Main] until the last week that had domestic violence. [Mother] testified that she is no longer involved with [Main] and will not get back together with him. Even if this testimony is true and [Mother] does not get back together with [Main], the Court cannot find that [Mother] has made a lasting adjustment of

circumstances that would make it safe for the children to be in her home. This factor favors termination of Respondent's parental rights.

k. Pursuant to T.C.A. § 36-1-113(i)(1)(K), whether the mother has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions. [Mother] has not taken advantage of all of the services offered to her by the Department and she did not testify as to completing any community-based services. This factor favors termination of Respondent's parental rights.

1. Pursuant to T.C.A. § 36-1-113(i)(1)(L), whether the children are in the custody of the Department, and the Department has made reasonable efforts to assist the mother in making a lasting adjustment. Mr. Tate and Ms. Jones testified as to the efforts they made to engage with and work with [Mother]. This factor favors termination of Respondent's parental rights.

m. Pursuant to T.C.A. § 36-1-113(i)(1)(M), whether the mother has demonstrated a sense of urgency in seeking custody of the children or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the children's best interest. [Mother] has not demonstrated urgency in rectifying her circumstances. [Mother] has declined to provide her first mental health evaluation to the Department or to take another one at the Department's expense. [Mother] did not submit to the parenting assessment the Department arranged for her. [Mother] does not even visit the children regularly despite being afforded opportunities to do so. This factor favors termination of Respondent's parental rights.

n. Pursuant to T.C.A. § 36-1-113(i)(1)(N), whether the mother or other person residing with or frequenting the home of the mother has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the children or any other child or adult. As recently as the week before trial, [Mother's] paramour [Main] who often stayed with her, was physically abusing her. [Mother] admits this abuse had happened at least once before and there was testimony about four separate domestic violence incidents. [Mother] alleges she was twenty weeks pregnant with [Main's] twins until he beat her last weekend and she miscarried the babies. This factor favors termination of Respondent's parental rights.

o. Pursuant to T.C.A. § 36-1-113(i)(1)(O), whether the mother has ever provided safe and stable care for the children or any other child. [Mother] has only ever parented Zala for one week prior to her removal into foster care and she never parented Bella prior to her removal into foster care. This factor favors termination of Respondent's parental rights.

- 17 -

p. Pursuant to T.C.A. § 36-1-113(i)(1)(P), whether the mother has demonstrated an understanding of the basic and specific needs required for the children to thrive. [Mother] does not seem to understand her children's specific needs. [Mother] testified that she loves her children, and the Court has no reason to doubt that, but [Mother] takes no responsibility for and seems not to understand the legitimate concerns regarding her ongoing domestic violence relationships and her unstable mental health[.] This factor favors termination of Respondent's parental rights.

q. Pursuant to T.C.A. § 36-1-113(i)(1)(Q), whether the mother has demonstrated the ability and commitment to creating and maintaining a home that meets the children's basic and specific needs and in which the children can thrive. [Mother] does not seem to understand her children's specific needs. [Mother] testified that she loves her children, and the Court has no reason to doubt that, but [Mother] takes no responsibility for and seems not to understand the legitimate concerns regarding her ongoing domestic violence relationships and her unstable mental health. This factor favors termination of Respondent's parental rights.

r. Pursuant to T.C.A. § 36-1-113(i)(1)(R), whether the physical environment of mother's home is unhealthy and not safe for the children. [Mother] has not allowed the Department in her current home, but the Court has concerns regarding the safety of the apartment in light of [Mother's] association with [Main]. This factor favors termination of Respondent's parental rights.

s. Pursuant to T.C.A. § 36-1-113(i)(1)(S), whether the mother has consistently provided more than token financial support for the children. Testimony was that [Mother] does provide clothing and gifts for the children when she visits with them. This factor weighs against termination of Respondent's parental rights.

t. Pursuant to T.C.A. § 36-1-113(i)(1)(T), whether the mental or emotional fitness of mother would be detrimental to the children or prevent mother from consistently and effectively providing safe and stable care and supervision of the children. [Mother] testified that she has schizophrenia and sometimes she has "agitation." Her testimony and demeanor at trial were of one struggling with mental or emotional issues in a manner that would keep her from providing her children safe and stable care. This factor favors termination of Respondent's parental rights.

The trial court's findings of fact are apt and supported by the record. Mother argues that "a number of the factors weighed for the mother therefore returning the children to the

mother's custody would be in their best interest."[9]  However, we cannot agree.  Nearly all the best interest factors favor terminating Mother's parental rights.  Mother has not maintained a home free of domestic violence or appropriately addressed her mental health concerns in the years since the Children were removed from her custody.  Conversely, it is undisputed that the Children have bonded with the foster parents, who wish to adopt them.  They have integrated well into their foster home and have bonded with the foster parents' other children and extended relatives. By all accounts, the Children are safe and well-adjusted, and it is clear from the record that a change in caregivers at this point would have a detrimental effect on their emotional and psychological welfare.  From the totality of the circumstances, there is clear and convincing evidence to support the trial court's finding that termination of Mother's parental rights is in the Children's best interests.

## CONCLUSION

The judgment of the Juvenile Court for Shelby County is affirmed, and this case is remanded for proceedings consistent with this opinion.  Costs on appeal are assessed to the appellant, Elizabeth S., for which execution may issue if necessary.

_____
KRISTI M. DAVIS, JUDGE

---

[9] This conclusory statement is the entirety of the argument offered by Mother as to this issue on appeal.  She does not make any effort to identify the factors that purportedly weighed in her favor or to argue that the trial court erred in any of its findings as to these factors.  Other portions of Mother's brief are replete with typographical errors.  For example, a portion of Mother's argument regarding the persistent conditions ground is: "She testified that she was no long either the children's father now [Main], her ex-boyfriend." (All errors in original).  Moreover, this fact is one of many presented in the argument section of Mother's appellate brief without an appropriate reference to the record as required by Tennessee Rule of Appellate Procedure 27(a)(7)(A).  We note that Mother is represented by appointed counsel in this matter and that our review of the trial court's findings functions as a procedural safeguard to ensure that parents in termination proceedings are afforded the fundamentally fair procedures to which they are entitled. *See In re Carrington H.*, 483 S.W.3d at 535.  However, we remind counsel that this procedural safeguard does not relieve counsel of the professional obligation to zealously advocate for their client and to represent their client competently and diligently. *See id.* at 534 (citing Tenn. Sup. Ct. R. 8, RPC 1.1, 1.3).  This admonition notwithstanding, given the specific facts of this case, we find that the representation provided to Mother by counsel was not so deficient as to deprive her of the fundamentally fair procedures to which she is entitled.